22CA2255 Peo v Blake 11-13-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA2255
El Paso County District Court No. 21CR951
Honorable Samuel A. Evig, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Dermot Andrew Blake,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE WELLING
Sullivan and Bernard*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 13, 2025

Philip J. Weiser, Attorney General, Josiah Beamish, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John Plimpton, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    Defendant, Dermot Andrew Blake, appeals his conviction for one count of first degree murder and two counts of child abuse. On appeal, Blake raises a single issue: whether the trial court reversibly erred in denying his motion for a mistrial based on the prosecution's untimely disclosure of the contents of the victim's cell phone. We conclude it didn't and affirm.

## I.    Background

¶ 2    A little after midnight on February 20, 2021, Blake shot and killed his wife in their family home. A neighbor's security system captured the sound of gunshots and screaming from Blake's home at the time of the shooting. Blake shot the victim eleven times over the course of approximately four minutes. The final seven gunshots occurred within ten seconds.

¶ 3    Blake and the victim have two children together, and those children were in the home at the time of the shooting. The noise from the shooting woke up the two children, who left their bedroom and saw Blake shoot and kill their mother.

¶ 4    Shortly after the shooting, Blake called 911 and reported that he had just shot his wife. Responding officers found the victim on a landing outside of the master bedroom. They also found what was

believed to be the victim's cell phone on the bed in the master bedroom.

## A. Pretrial CRE 404(b) Litigation

¶ 5    In advance of trial, the defense filed a "Motion for Notice of 404(b) Evidence and Objection to the Introduction of Any Such Evidence at Trial." The prosecution didn't file an intent to introduce any CRE 404(b) evidence. Yet at a subsequent motions hearing, the prosecutor requested to introduce evidence of a previous allegation that Blake had struck the victim and broke her jaw.[1] Defense counsel objected and requested that the trial court enter an order barring the prosecution from introducing any CRE 404(b) evidence at trial because the prosecution didn't file a timely notice of intent to introduce such evidence.

¶ 6    The trial court agreed with defense counsel and excluded any CRE 404(b) evidence from the prosecution's case-in-chief.

---

[1] The prosecution also requested to introduce evidence that Blake had filed for divorce in 2019 and that the request was later "mutually withdrawn."

2

## B.    Blake's Trial

¶ 7    Blake's jury trial started on November 1, 2022.  Blake's theory of defense at trial was that he was intoxicated and shot the victim impulsively and without the deliberation required for first degree murder.  Blake's defense also focused on the lack of evidence of what happened immediately before the shooting, arguing that based on the lack of any other explanation, he must have "snapped."  The prosecution's theory at trial was that circumstantial evidence, including the number and timing of shots, was indicative of deliberation.

¶ 8    Neither side presented much evidence about what happened in the family home immediately before the shooting.  But the prosecution did present evidence as to what happened earlier in the evening before the shooting.  In that regard, Brian Bethea, an acquaintance of Blake, testified that Blake was at a bar with him before the shooting.  He testified that while at the bar, Blake had "seemed kind of like paranoid or kind of wanting to argue back with [him] a little bit."

¶ 9    As for the CRE 404(b) evidence the trial court had excluded, shortly after opening statements, the prosecutor told the trial court

and the defense that the prosecution would argue that the defense opened the door to CRE 404(b) evidence if the defense introduced any evidence regarding the prior interactions between Blake and the victim.

¶ 10    On the fourth day of trial — Friday, November 4, 2022 — and between prosecution witnesses, the prosecutor put the defense on notice that if Blake testified, the prosecutor may seek to introduce (1) the CRE 404(b) evidence that was the subject of pretrial litigation and (2) the contents from a download of the victim's cell phone.  The prosecutor explained that if Blake testified about what happened between him and the victim immediately before the shooting or any other "incidents" between them, then "there's a lot of information in [the victim's] phone that would go to rebut that testimony."

¶ 11    Defense counsel argued against the prosecutor's introducing any CRE 404(b) evidence and "any of the friends' text messages." The prosecutor later clarified to the trial court and the defense that the CRE 404(b) evidence included "all the prior times the [d]efendant ha[d] threatened the life of the victim, that he ha[d]

physically assaulted her, and that he ha[d] threatened to kill her if she left him."

¶ 12    There is no further explanation in the trial transcript about the specific evidence from the victim's cell phone that the prosecution would have used in rebuttal.  But the affidavit for the search warrant of the victim's cell phone included information from the victim's friends that (1) one friend had photographs of the victim with bruises caused by Blake; and (2) the victim was planning to take her children and leave Blake on February 19, 2021, but decided to wait until the next morning.

¶ 13    The trial court paused the discussion regarding the cell phone contents until the end of the day so that the trial could proceed. After the trial day ended and the court sent the jury home for the evening, the parties revisited the issue.  Defense counsel indicated that the evidence from the victim's cell phone hadn't been disclosed to them previously.  Defense counsel explained that in April 2021 the prosecution had disclosed what the prosecution had thought to be the contents of the victim's cell phone.  But defense counsel stated that the file the prosecution provided only contained "a warrant and eight or ten pictures."

¶ 14    Defense counsel went on to explain that sometime after reviewing the April 2021 disclosure, they asked the prosecutor if that was the entire file, and in March 2022, the prosecution responded by turning over to the defense a hard drive with what they purported was the entire file. That hard drive, however, contained only photographs of the victim's cell phone itself and the search warrant that permitted law enforcement to seize and search the cell phone.

¶ 15    Because it was Friday, defense counsel requested that the trial court give them the weekend to review the cell phone contents and finalize their remedy request, but counsel preliminarily indicated that they believed that the late disclosure was a "discovery violation."

¶ 16    After returning to court on Monday, November 7, 2022, defense counsel requested a mistrial due to the prosecution's untimely disclosure of the contents of the victim's cell phone. Defense counsel argued that the prosecution had violated *Brady v. Maryland*, 373 U.S. 83 (1963), and Crim. P. 16 by failing to disclose this cell phone data. Defense counsel explained that they followed up with the prosecution after receiving the April 2021 disclosure to

6

make sure the file was complete, and the prosecution hadn't given them access to the data at that time. Therefore, they argued, they didn't have access to the contents of the victim's cell phone until the prosecution disclosed it to them midtrial.

¶ 17 Defense counsel also told the court that they conducted a preliminary review of the cell phone contents over the weekend. From that review, defense counsel found a sexually explicit photograph from a male paramour of the victim and some text messages between the victim and the photograph's sender indicating that they were having an extramarital affair. Defense counsel didn't mention any other specific contents of the victim's cell phone to the trial court during their argument for a mistrial.

¶ 18 In sum, defense counsel argued that the late-disclosed data "affects . . . all the decisions that we've made." Defense counsel noted that they would now want to interview the sender of the text messages. Ultimately, defense counsel concluded that the trial

court should declare a mistrial because they couldn't review the data completely until after trial due to its large volume.[2]

¶ 19    The prosecutor responded that the prosecution had disclosed the cell phone contents to the defense previously and that it wasn't their fault if the defense couldn't access it.  The prosecutor also argued that other portions of the discovery provided to the defense referenced the victim allegedly being engaged in an extramarital affair, so the defense was on notice that such a relationship existed. Specifically, the prosecutor pointed out that one of the victim's acquaintances had told police that the victim and an alleged paramour had a date scheduled for the week before or the week of the shooting.  The prosecutor further indicated that the acquaintance had met with the defense before trial and told the defense investigator about the victim's "love life."

---

[2] There is no dispute that the download of the victim's cell phone contents was voluminous (approximately 100 gigabytes).  But the only potentially material evidence that the defense found over the weekend from the download was limited to a few generally romantic text messages and one explicit photograph from the sender of the romantic text messages.  Since that time (including on appeal), the defense hasn't identified any other potentially material evidence from the victim's cell phone.

¶ 20     Finally, the prosecutor explained that he assumed that defense counsel was arguing that this data would have led them to investigate a heat of passion defense for trial.  But the prosecutor argued that to support a heat of passion defense, the defense would need to show that Blake knew about these text messages and photograph at the time of the shooting.  The prosecutor contended that the defense wouldn't be able to show this link.

¶ 21     In rebuttal, defense counsel summed up their argument for a mistrial, explaining,

> It literally changes the witnesses we would endorse, the witness[es] we would call, our advice to Mr. Blake about whether he should testify or not, the nature of that testimony. This literally shifts everything in a different direction from where we are headed now and where we have been headed.

¶ 22     After returning to court the next day, the trial court found that the prosecution had "compl[ied]" with its discovery obligations, pointing out that the prosecution didn't withhold the evidence in bad faith and "[i]n fact, the record demonstrates [the prosecution's] efforts to discover it and their efforts to provide it."  The trial court also explained that "the [d]efense knew the existence of the download from the victim's cell phone and the report contains a

9

spreadsheet of call logs" and that even though the defense couldn't access the information, "[t]hey had reason to know it" existed. The trial court determined that the defense "had some obligation to alert" the prosecution that the download they had received didn't include the contents of the victim's cell phone.

¶ 23 Next, the trial court found that the defense hadn't established that the evidence would be exculpatory. The trial court explained that it was a *possibility* that the evidence could have potentially supported a heat of passion defense, but that there was "a link missing" and that "Blake would have to [have been] aware of those messages for them to serve as a potential driver with the heat of passion instruction." The trial court also noted that the evidence was actually potentially inculpatory because the "fact that [the victim] may have had a relationship with someone else . . . is something that is so far lacking in the [p]rosecution's case. It provides a motive for a homicide."

¶ 24 In terms of whether any late disclosure of the victim's cell phone contents prejudiced the defense, the trial court said, "Potentially, the information could lead to other witnesses. And that is a potentiality; it's not a demonstrated fact. Potentially, it

might [lea]d to another defense being offered. But on the state of the evidence right now, that too is speculative. That too is a potentiality."

¶ 25    The trial court ended by explaining that a mistrial "is warranted only when the prejudice is too substantial to be remedied by any other means." It explained that before a mistrial is warranted, "manifest necessity" must be shown and that it is shown "when the [c]ourt finds in its discretion that the interest of public justice would not be served by continuing the proceedings." The trial court then concluded that the defense hadn't shown the requisite manifest necessity to justify declaring a mistrial and, therefore, denied the defense's motion.

¶ 26    Blake's trial resumed. At no point did the prosecution, the defense, or any witnesses mention the contents of the victim's cell phone or the victim's alleged extramarital affair. Blake didn't testify, and the prosecution didn't seek to introduce any CRE 404(b) evidence. During the jury instruction conference, defense counsel requested a heat of passion jury instruction. The trial court declined to give such an instruction due to the absence of evidence

11

supporting heat of passion. Ultimately, the jury found Blake guilty of first degree murder and two counts of child abuse.

## II. Analysis

¶ 27 On appeal, Blake contends that the trial court abused its discretion when it denied his motion for a mistrial. We disagree. In reaching this conclusion, we first discuss our standard of review and the legal principles underlying an alleged *Brady* and Crim. P. 16 violation. We then turn to whether the prosecution failed to timely disclose the contents of the victim's cell phone and whether the trial court made specific findings on the question, including whether it was defense counsel's fault they couldn't access the data earlier. We also analyze whether the trial court misunderstood the law regarding the parties' obligations during disclosure.

¶ 28 After analyzing the trial court's findings, we assume for the purpose of our analysis that the prosecution did fail to timely disclose this evidence to the defense (and that the trial court erred in concluding otherwise). With that assumption in mind, we address whether the late-disclosed evidence was (1) exculpatory and (2) material under *Brady*, concluding that the trial court correctly determined that it wasn't.

## A. Standard of Review and Legal Principles

¶ 29 We review the denial of a motion for a mistrial for an abuse of discretion. *People v. Johnson*, 2017 COA 11, ¶ 39. "A trial court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding or application of the law." *Id.* A mistrial is a drastic remedy and is warranted only when prejudice to the accused is so substantial that its effect on the jury can't be remedied by other means. *People v. Ned*, 923 P.2d 271, 274 (Colo. App. 1996).

### 1. *Brady*

¶ 30 Whether there was a *Brady* violation presents a mixed question of law and fact. *People v. Bueno*, 2018 CO 4, ¶ 20 (citing *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 827 (10th Cir. 1995)). When reviewing a mixed question of law and fact, we review the trial court's findings of fact for clear error and its conclusions of law de novo. *Id.* A trial court clearly errs if its factual finding is without support in the record. *Id.*

¶ 31 The U.S. and Colorado Constitutions guarantee a defendant due process of law. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25. The U.S. Supreme Court in *Brady* held that "suppression

by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. Suppression under *Brady* occurs when the prosecution fails to disclose exculpatory and material evidence to the defense.[3] *Smith,* 50 F.3d at 824. This obligation exists independent of a request for such evidence by the defense. *United States v. Agurs,* 427 U.S. 97, 110-11 (1976), *abrogated on other grounds by, United States v. Bagley,* 473 U.S. 667, 682 (1985). Further, whether the prosecution acts in good or bad faith in failing

---

[3] Although the formulation of the suppression test under *Brady v. Maryland,* 373 U.S. 83 (1963), includes whether the evidence was exculpatory and material, Colorado courts seem to separate this analysis into three distinct inquiries. Courts first address whether evidence was "suppressed" — that is, not disclosed when it should have been — and then separately address whether the evidence was exculpatory and material. *See, e.g.*, *People v. Bueno,* 2018 CO 4, ¶ 42 (explaining that "because the trial court correctly concluded that the prosecution neither disclosed this evidence nor made it available to Bueno, we conclude that the prosecution did not satisfy its Rule 16 obligations and that it instead suppressed this evidence for *Brady* purposes" and then analyzing whether the evidence was exculpatory and material); *People v. Flynn,* 2019 COA 105, ¶¶ 26-27 ("The first question is whether evidence was suppressed. Suppression occurs when a prosecutor fails to disclose evidence, regardless of whether the prosecutor acts in bad faith."). Our *Brady* analysis therefore will follow this three-part test of (1) whether there was a failure to disclose; (2) whether the evidence was exculpatory; and (3) whether the evidence was material.

to disclose evidence is irrelevant to determining whether there was a *Brady* violation. *Kyles v. Whitley*, 514 U.S. 419, 432 (1995).

¶ 32 "[E]vidence is *exculpatory* for *Brady* purposes if it tends to mitigate the likelihood of guilt or the severity of the sentence." *Bueno*, ¶ 31. Evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.*

### 2. Crim. P. 16

¶ 33 Crim. P. 16(I)(a)(1) requires prosecutors to "make available" enumerated "material and information which is within [their] possession or control." Crim. P. 16(I)(a)(2) requires prosecutors to "disclose to the defense any material or information within [their] possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce the punishment therefor." Colorado courts have consistently interpreted this requirement as coextensive with *Brady*'s materiality standard. *Bueno*, ¶ 28; *see also In re Att'y C*, 47 P.3d 1167, 1170-71 (Colo. 2002) ("Hence, the materiality standard of *Brady* . . . applies to Rule

15

16 disclosures in Colorado."). We therefore evaluate Blake's Rule 16 claim using *Brady*'s materiality standard.

### B. Failure to Disclose

¶ 34 First, we address whether the prosecution failed to timely disclose to the defense the contents of the victim's cell phone and whether the trial court made specific findings on that question.

¶ 35 The trial court found that the prosecution had complied with its discovery obligations. On appeal, Blake argues that in reaching that conclusion, the trial court erroneously considered (1) the prosecution's good faith and (2) that the defense should have known about the missing evidence. We agree with Blake that to the extent the trial court's conclusion rests on a finding that the prosecution acted in good faith or that the defense should have known about the missing evidence and thus requested it, that was error. *See Kyles*, 514 U.S. at 432; *Agurs*, 427 U.S. at 110-11; *see also Bueno* ¶ 40 ("[T]he defense need not search for a needle in a haystack . . . .").

¶ 36 To the extent that the trial court's conclusion rests on a finding that the defense couldn't access the data because of a technological problem on the defense's end, this would be a proper

basis for concluding the prosecution didn't fail to disclose the data, assuming that this finding was supported by the record. But the evidence — or representations made by the prosecution and defense during argument — was disputed on this issue. And the trial court didn't make any findings or resolve this factual dispute in its ruling. Indeed, the court explicitly didn't resolve this factual dispute.[4] Therefore, this can't provide an alternate basis for the trial court's finding that the prosecution "compl[ied]" with their discovery obligations. Accordingly, there is no basis in the record to support the trial court's finding that the prosecution "compl[ied]" with its discovery obligations.

---

[4] In making this finding, the trial court explained, "I don't know how the download failed and I don't quite understand why the [d]efense couldn't access that information, but the [p]rosecution made all the appropriate efforts to fulfill their obligations." At the end of the trial court's ruling, defense counsel responded to this factual question, stating that "the [c]ourt kept referring to the fact that we couldn't access the information. That's just factually incorrect," and concluding that "it wasn't an issue with access or ability or any of that. We got what they sent us." The trial court responded, "Okay. I understand, and I definitely think you're correct in terms of the contents of it. But again, I don't know exactly how that disconnect occurred, in terms of what you got versus what they provided. So I do think that that part of it is correct."

¶ 37    Still, the lack of record support for the trial court's finding that the prosecution complied with its discovery obligations doesn't establish the opposite: that the prosecution *failed* to comply with those obligations.  In any event, for purposes of our analysis, we will assume without deciding that the prosecution failed to disclose the evidence to the defense in a timely manner and that the trial court erred by making a contrary finding.[5]

## C.    Exculpatory Nature

¶ 38    Next, we turn to whether the late-disclosed evidence was exculpatory under *Brady*.  The trial court found that it wasn't.  We agree.

¶ 39    Both during the litigation of his motion for a mistrial and on appeal, Blake's discussion of the potentially material evidence on the victim's cell phone is limited to a sexually explicit photograph and texts between the victim and another man that are strongly

---

[5] By assuming that the prosecution failed to disclose, and thus "suppressed," the evidence, we aren't also assuming that the evidence was exculpatory and material as the definition of suppression under *Brady* often includes.  *See Bueno*, ¶ 30 ("[S]*uppression* for *Brady* purposes occurs where prosecutors fail to disclose material and exculpatory evidence to the defense.").  We merely assume that the prosecution didn't timely disclose evidence to the defense that they should have disclosed.

18

indictive of a romantic relationship between the sender and the victim. Blake contends that this evidence was exculpatory because it tends to mitigate the likelihood that Blake shot the victim after deliberation, the required mens rea for first degree murder. He argues that the evidence instead supports an inference that Blake shot the victim in the heat of passion after finding the text messages and photograph on her phone indicating that she was having an extramarital affair.

¶ 40    The defendant bears the burden of establishing a *Brady* violation. *Bueno*, ¶ 29; *see Smith*, 50 F.3d at 824. We agree with the trial court that Blake didn't meet this burden for two reasons: The evidence is only potentially exculpatory with additional evidence; and without that additional evidence, it is either irrelevant or inculpatory.

¶ 41    First, the evidence that the victim was having an extramarital affire is potentially exculpatory under a heat of passion defense[6] only with additional evidence that would have supported the elements of this defense. To be entitled to a heat of passion jury instruction,

> the defendant must produce evidence in support of the second-degree murder mitigator showing that: (1) the act causing the death was performed upon a sudden heat of passion; (2) caused by a serious and highly provoking act of the intended victim; (3) which was sufficient to excite an irresistible passion in a reasonable person; and (4) between the provocation and the killing, an insufficient interval of time passed for the voice of reason and humanity to be heard.

*Cassels v. People*, 92 P.3d 951, 956 (Colo. 2004); *see also* § 18–3–103(3)(b), C.R.S. 2025 (second degree murder statute).

---

[6] During defense counsel's argument in support of their motion for a mistrial to the trial court, they initially argued that the suppressed evidence could support self-defense in addition to a heat of passion defense. After questioning from the trial court, defense counsel ultimately agreed with the trial court that the cell phone evidence "neither supports nor contradicts self-defense." On appeal, Blake doesn't contend that the evidence supported a self-defense claim and instead focuses his argument on the heat of passion defense. We therefore focus only on heat of passion as well.

¶ 42    In finding no *Brady* violation, the trial court noted that there was a "link missing" between the contents of the cell phone and a heat of passion defense.  We agree that additional evidence was needed for the cell phone contents to be exculpatory.

¶ 43    This additional evidence would include something like (1) not only did Blake actually see the text messages and photograph before the shooting, but also he first saw them close in time to shooting the victim; (2) finding the text messages and photograph would reasonably inflame someone so much that they would have been provoked to shoot their wife; and (3) there was no time for Blake to calm down between seeing the text messages and photograph and shooting his wife.

¶ 44    Neither during trial nor on appeal has Blake provided this evidence or an offer of proof that such evidence exists.  *See Smith*, 50 F.3d at 824.  At trial, defense counsel only generally said that the late-disclosed evidence would have changed their trial strategy.  This by itself isn't a sufficient offer of proof.  During their argument to the trial court, defense counsel explained that they probably would have called different witnesses to testify at trial.  The closest counsel came to providing any specifics in this regard was saying

"that Mr. Bethea [Blake's acquaintance who was with him at a bar earlier in the evening of the shooting] and other witnesses could have testified that Mr. Blake thought he was being cheated on" and that those witnesses would have been able to provide testimony that Blake knew about the victim's extramarital affair.

¶ 45 But the evidence recited in this proffer *undermines* any alleged exculpatory value of the evidence, as even if Mr. Bethea or others had offered this testimony, it would have cut against a heat of passion theory. This is so because testimony that Blake knew about the affair prior to the shooting — and not that he learned of it immediately before the shooting — cuts against the notion that he committed the act under heat of passion. Instead, such evidence of Blake's prior knowledge of the affair would have provided motive and further support that he acted after deliberation.

¶ 46 The proffer therefore didn't include a sufficient explanation of how the defense would have tried to prove that Blake knew about the affair *immediately* before the shooting and that this knowledge led to the shooting. As a result, based on the argument presented at trial, the contents of the victim's cell phone didn't "tend[] to

22

mitigate the likelihood of [Blake's] guilt" without additional evidence. *Bueno*, ¶ 31.

¶ 47    At most, the data was "potentially useful." *People v. Eason*, 2022 COA 54, ¶ 38.  If the cell phone data wasn't "apparently exculpatory, but only potentially useful, [Blake could] alternatively establish[] a due process violation if he shows that the [prosecution] suppressed or destroyed the evidence in bad faith." *Id.* (citing *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988)).  Here, though, Blake doesn't allege that the prosecution withheld the contents of the victim's cell phone in bad faith, so he hasn't established a due process violation under this alternate route either.

¶ 48    Second, without this additional evidence, the contents of the victim's cell phone are either irrelevant or inculpatory.  As discussed before, the text messages and the photograph are relevant only if Blake saw them before the shooting.  Furthermore, it's as likely — if not more likely — for the evidence to be inculpatory by providing a motive for the shooting, something the prosecution was missing at trial.  In other words, the text messages and photograph could show that Blake killed the victim because she was having an extramarital affair.  *See People v. Jowell*, 199

P.3d 38, 43 (Colo. App. 2008) ("[T]he defendant does not have a due process right to receive notice of inculpatory evidence . . . ."); *Gray v. Netherland*, 518 U.S. 152, 168 (1996) (discussing that *Brady* didn't create a general right to discovery in a criminal case and only addressed exculpatory evidence).

¶ 49  We aren't persuaded otherwise by *Bueno*, in which the supreme court explained that "undisclosed evidence need not be admissible to satisfy *Brady*; it need merely lead to the possible discovery of other evidence." *Bueno*, ¶ 44 n.12. In *Bueno*, the defendant was charged with killing a fellow inmate at a state prison. *Id.* at ¶ 1. The prosecution didn't disclose to the defense two reports written by correctional facility staff until fifteen months after Bueno's conviction. *Id.* Those reports contained evidence that a white supremacist group had planned to murder white inmates. *Id.* Bueno was convicted of murdering a white inmate. *Id.* at ¶ 43. The trial court in *Bueno* found that the prosecution violated *Brady*'s disclosure requirements because the reports were exculpatory and material to the defense. *Id.* at ¶¶ 1, 43-45.

¶ 50  The supreme court agreed and concluded that the trial court didn't abuse its discretion in ordering a new trial due to the *Brady*

24

violation. *Id.* at ¶ 3. But there is a key difference between the late-disclosed evidence in *Bueno* and the late-disclosed evidence here. In *Bueno,* the supreme court found that the withheld reports "bear directly on the issue of the murderer's identity." *Id.* at ¶ 46. But here, the victim's cell phone contents in isolation didn't bear directly on heat of passion; instead, other evidence was necessary before the late-disclosed evidence could have any bearing on a disputed issue. And the defense didn't — and still doesn't on appeal — explain what other evidence the victim's cell phone contents could have led them to that would have borne directly on heat of passion. Thus, because the evidence in *Bueno* bore directly on the key issue at trial — the identity of the killer — it was material. Such a strong connection to a key issue in trial, as explained above, is not present here.

¶ 51 Finally, Blake argues that the trial court applied a higher standard for whether evidence is exculpatory by stating that the evidence here wasn't "clearly exculpatory." Blake contends that the evidence only needs to "tend to mitigate the likelihood of guilt" to be exculpatory.

¶ 52    We disagree that the trial court applied a higher standard for evaluating whether the late-disclosed evidence was exculpatory. The trial court noted that the messages "show a motive for Mr. Blake potentially to have a reason to be angry with [the victim] and potentially establish a motive to murder [the victim]." The trial court then explained that it was "having trouble finding that [this evidence] is exculpatory evidence," which makes sense given that additional evidence — which wasn't proffered — was required before the late-disclosed evidence could have any exculpatory value. Simply put, the record demonstrates that the trial court correctly applied the standard of "tend[ing] to mitigate the likelihood of guilt," *Bueno*, ¶ 31, and correctly determined that the contents of the victim's cell phone weren't exculpatory.

## D.  Materiality

¶ 53     Third, we turn to whether the evidence was material under *Brady*.  The trial court found that the contents of the victim's cell phone weren't material under *Brady*.[7]  We agree.

¶ 54     Blake argues that had the cell phone data been turned over to the defense in a timely manner, there is a reasonable probability that the jury would have found Blake not guilty of first degree murder.  Specifically, Blake contends that there was no evidence about what occurred in the family home prior to the shooting.  He further argues that these text messages and photograph now shed some light on what may have happened before the shooting, introducing the possibility that Blake saw the text messages and photograph and shot the victim in an impulsive state.  Blake also

---

[7] During argument, the defense and trial court focused primarily on whether the defense was "prejudiced" by the late disclosure of the cell phone contents.  The materiality standard under *Brady* often is explained in terms of "prejudice" to the defense and the terms are often used interchangeably.  *See, e.g., Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) ("There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and *prejudice* must have ensued." (emphasis added)).  To stay consistent within this opinion and with other divisions of this court, we refer to *Brady*'s third prong as "materiality."

argues that his conduct before and after the shooting was consistent with someone who "snapped and lost control." In sum, Blake contends that a defense case based on a heat of passion theory would have been much stronger than the theory he pursued at trial — namely, that Blake was intoxicated and shot the victim impulsively and without the deliberation required for first degree murder.

¶ 55 Blake bears the burden of establishing that the evidence was material. *Bueno*, ¶ 29; *see Smith*, 50 F.3d at 824. Blake didn't meet this burden for two reasons.

¶ 56 First, Blake's explanation of materiality to the trial court and on appeal is vague and speculative. To the trial court, defense counsel stated that the evidence would have led them to "probably run[ing] a different defense" and that "it literally changes the witnesses we would endorse, the witness[es] we would call, our advice to Mr. Blake about whether he should testify or not, the nature of that testimony." But defense counsel didn't explain *how* the evidence would have changed the witnesses they would have called or how their advice to Blake would have changed. Nor is there any articulation or proffer as to what Blake would have

testified to at trial had he chosen to do so. Without more, defense counsel's argument for materiality "does not rise to the level of more than the kind of 'vague assertion' we have deemed inadequate to mandate disclosure." *Zapata v. People*, 2018 CO 82, ¶ 55. Without more specific information about how having the victim's cell phone contents before trial would have impacted the evidence presented at trial, Blake's articulation of materiality remains vague and speculative.

¶ 57 Nor are we persuaded that the sheer volume of the undisclosed evidence — approximately 100 gigabytes — renders the nondisclosure inherently material and prejudicial. While we wouldn't expect defense counsel to review the entire file between its disclosure on a Friday and defense counsel's *Brady* argument to the trial court on the following Monday, it has now been more than two years since the prosecution disclosed the file to defense counsel. Yet on appeal Blake's argument still exclusively focuses on the one sexually explicit photograph and chain of romantic text messages

purporting to show an affair between the sender and the victim.[8]

Thus, we aren't persuaded that the sheer volume of the late-disclosed evidence has a bearing on the materiality or prejudice analysis.

¶ 58      Second, the evidence against Blake at trial was overwhelming. *See People v. Mendez*, 2017 COA 129, ¶ 45 (noting the overwhelming evidence at trial supporting the defendant's conviction and concluding that although the prosecutor violated *Brady*, "there is no reasonable possibility that the district court's failure to provide an adequate sanction 'might have contributed to the conviction'" (quoting *Hagos v. People*, 2012 CO 63, ¶ 11)).  At trial, Blake didn't contest that he fatally shot the victim.  Instead, the primary issue at trial was whether he had the required mens rea for first degree murder.  The evidence against Blake in this regard included that (1) Blake was in a confrontational mood earlier in the evening with his friend at a bar; (2) the audio of the neighbor's security camera recording captured that the shots

---

[8] Although not admitted at trial or shown to the jury, the entire contents of the victim's cell phone that were disclosed during trial are included in the trial court record and the record on appeal lodged with this court.

spanned three minutes and fifty-five seconds; (3) his two young daughters saw the shooting firsthand; and (4) Blake himself called 911 and confessed to shooting and killing the victim. As mentioned above, there was no evidence or proffer that Blake had just found out about the victim's extramarital affair or even that he knew the extramarital affair existed. Given the strength of the evidence against Blake at his trial, there isn't "a reasonable probability that, had the [contents of the victim's cell phone] been disclosed to the defense, the result of the proceeding would have been different." *Bueno*, ¶ 32 (quoting *Bagley*, 473 U.S. at 676).

¶ 59 Moreover, there is support in the record for the trial court's observation that the discovery already disclosed to the defense contained references to the victim's extramarital affair. This means that the prosecution's late disclosure of the cell phone contents wasn't the first time the defense had access to evidence about an alleged extramarital affair, further mitigating any prejudice.

¶ 60 Blake also argues that it's unclear if the trial court applied the correct materiality standard because it didn't explain the "reasonable probability" standard it applied during its ruling. We disagree. In its ruling on the defense's motion for a mistrial, the

31

trial court noted that the defense's articulation of prejudice was "speculative" and that "potentially the information could lead to other witnesses," and but it concluded that, too, was "speculative." These findings regarding the speculative nature of Blake's prejudice and materiality arguments are wholly consistent with the trial court considering whether there was a reasonable probability that the late-disclosed evidence might have contributed to Blake's conviction. Therefore, we aren't persuaded that the trial court applied an incorrect legal standard regarding materiality under *Brady*.

¶ 61 Because the trial court's determinations support a legal conclusion that the prosecution didn't violate *Brady*, we conclude that it didn't abuse its discretion by denying Blake's motion for mistrial.

## E. Remaining Contention

¶ 62 Finally, Blake argues that the trial court applied the incorrect standard in determining whether a mistrial was warranted. The trial court analyzed whether the defense had shown "manifest necessity." We agree that manifest necessity is only required when the defense doesn't consent to the motion for a mistrial. *See People*

*v. Berreth,* 13 P.3d 1214, 1216 (Colo. 2000) ("If a criminal trial is terminated prior to its completion, double jeopardy will bar a second trial unless the trial court has sufficient legal justification for declaring a mistrial over the defendant's objection. Such justification exists only if, under all the circumstances of the case, there is a 'manifest necessity' for the mistrial." (citations omitted)).

¶ 63    Here, the defense asked for the mistrial and thus consented to the requested mistrial, meaning the trial court applied the incorrect manifest necessity standard to the defense's request. But ultimately, because the trial court correctly analyzed whether the evidence was exculpatory and material and used that analysis to find that there was no *Brady* violation, the manifest necessity analysis was unnecessary to the trial court's conclusion that a mistrial wasn't warranted.

### III.    Disposition

¶ 64    The judgment is affirmed.

JUDGE SULLIVAN and JUDGE BERNARD concur.